IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

HUMBERTO LAGAR,

                         Plaintiff,                        OPINION & ORDER

   v.

                                                    14-cv-036-wmc

LIZZIE A. TEGELS, S. BARTON
and EILENE MILLER,

                         Defendants.

---

     *Pro se* plaintiff Humberto Lagar was granted leave to proceed under 42 U.S.C. § 1983 on claims that officials at Jackson Correctional Institution ("JCI") violated his First and Fourteenth Amendment rights when they refused to let him record a "talking letter" to his mother in Spanish. After plaintiff moved for a preliminary injunction (dkt. #11), asking that the court enter an order allowing all Spanish-speaking inmates to record Spanish talking letters immediately, defendants combined their opposition with a motion for summary judgment (dkt. #19), which has now been fully briefed. For the reasons discussed below, the court will deny the motion for preliminary injunction and grant defendants' motion for summary judgment.

UNDISPUTED FACTS[1]

## I.  The Parties

     At all times relevant to this complaint, plaintiff Humberto Lagar was an inmate at JCI in the custody of the Wisconsin Department of Corrections ("DOC"). Lagar is a native

---

[1] The following facts are drawn from the parties' proposed findings and responses on summary judgment. Since briefing was completed in May of 2015, some of the following facts are no longer be current. In particular, plaintiff Lagar is no longer incarcerated by the Wisconsin Department of Corrections. He is instead currently residing in Milwaukee, Wisconsin. Given that the outcome here depends on a discontinued program and past actions, the court deems it unnecessary to request a factual update from the parties.

of Cuba who left that country in 1980.  He reads, writes and speaks English fluently, but communicates with his mother and father exclusively in Spanish.  Lagar's parents are only able to communicate effectively in Spanish, in part because certain terms, phrases or axioms cannot be translated exactly between different languages and in part because their English is generally limited.

JCI is a medium-security institution located in Black River Falls, Wisconsin.  During the relevant period, defendant Scott Barton was employed by the DOC as a Corrections Program Supervisor at JCI; defendant Lizzie Tegels was employed as its Warden; and defendant Eilene Miller was employed by the DOC as recreation leader at JCI.  Miller stepped down as recreation leader in September of 2014.

## II. Outside Communication By Inmates At JCI

### A. DOC Mail and Telephone Policies

The DOC allows inmates to communicate with their families, friends and others to the extent it is consistent with the need to protect the public.  Communication fosters reintegration into the community and helps inmates maintain family ties.  Communication also helps motivate inmates, thus contributing to morale and security.

With limited exceptions for legal correspondence specified in Wis. Admin. Code § DOC 309.04(3),[2] correctional staff may open, inspect and read all incoming and outgoing mail in order to ensure the safety of the institution, staff and the general public.  Inmates may write letters in Spanish or other languages.  Those letters are subject to the same monitoring as other outgoing mail.

---

[2] Subject to some exceptions, Wis. Admin. Code § DOC 309.04(3) generally prohibits institution staff from opening or reading mail sent to an inmate from a specific list of correspondents, including attorneys, judges, clerks and various governmental officials.

Prison officials will not deliver mail if it: (1) threatens criminal activity or harm to any person; (2) threatens blackmail or extortion; (3) concerns the transport of contraband into or out of an institution; (4) concerns plans to escape; (5) concerns activity that, if completed, would violate state or federal law or administrative rules of the DOC; (6) is in code; (7) solicits gifts from someone other than a family member or a person on the inmate's visiting list; (8) is considered "injurious," meaning it is pornographic, facilitates criminal activity or poses a threat to security, orderly facility operation, discipline, safety or inmates' treatment and rehabilitative goals; (9) contains information that would create a clear danger of physical or mental harm to any person if communicated; (10) teaches or advocates illegal activity, disruption or behavior consistent with a gang or ritualistic group; (11) is determined by the warden, on a case-by-case basis, to interfere with an inmate's penological interests; or (12) is determined by the warden for other reasons to be inappropriate for distribution throughout the institution.  *See* Wis. Adm. Code § DOC 309.04(4)(c).  In addition, mail will not be delivered if it contains contraband.

One of the chief reasons that the institution monitors *outgoing* mail is for the protection of the public.  Some inmates confined in correctional institutions continue to manipulate, defraud or victimize others.  Monitoring outgoing mail also prevents inmates from coordinating assaults, escapes, attacks, riots, hostage-taking and other activities that jeopardize safety, and it helps make staff aware of communications between DOC Security Threat Groups, or gangs, which have historically used the mail to coordinate and

communicate. Finally, staff members monitor outgoing mail to watch for inmates corresponding on behalf of other inmates or soliciting information for other inmates.[3]

Like mail, telephone calls may be monitored, unless they are approved and authorized calls with an attorney. Like mail, nothing prevents inmates from utilizing the phones in various languages. JCI has a system that records and stores all an inmate's phone calls so that they are available if needed. If it were necessary to listen to a call not conducted in English, security would either involve a bilingual staff member or send the recording out to be transcribed by a company providing that service.

Consistent with the above, Lagar has never been denied the right to speak or write to his father or mother in Spanish at JCI or at any of the other Wisconsin correctional institutions in which he has been incarcerated.

## B. JCI's Talking Letter Program

### i. General policies

Generally speaking, JCI inmates have a variety of recreational opportunities and can participate in JCI's music program, sports activities, and a variety of hobbies. Inmates can also receive approved items into the institution for use in a hobby. More than 600 of JCI's 980 inmates have signed up for a hobby.

JCI's recreation leader administers all of these opportunities, including ordering supplies and materials, maintaining records and reports, performing inventory of equipment

---

[3] This latter behavior is prohibited for a number of reasons. First, the acting inmate may expect something in return for using his postage and envelope, creating a barter system, which gives inmates power and can lead to strong-arming, violence and disruptive conduct. Second, security is unable to monitor what an inmate is writing if he is doing so through another inmate. In particular, those with a history of solicitation or gang involvement could circumvent mail monitoring if they are able to persuade another inmate to write on their behalf.

and supplies, and doing general upkeep of equipment areas.  The recreation leader also maintains paperwork for property approvals.  Finally, the recreation leader supervises up to fifty-seven inmates in the cleaning and upkeep of certain hobby and recreation equipment.

In the past, the recreation director also administered a "talking letter program," which is considered a leisure activity and falls within the purview of the recreation department.  The talking letter program first began on August 28, 2007.  Inmates learned about it via a Daily Bulletin, which read in part:

> A new program is starting at Jackson Correctional Institution
>
> The Talking Letter
>
> Inmates are invited to use this program to talk on video tape to their family and friends.  The cost of the tape is $3.50.  A recreation Leader will be present to record the letter and must understand the contents of the letter.  The video tape must be sent out immediately after it is made to someone on your visiting list.

The talking letter program was created to be financially self-sufficient.  There has never been money in JCI's budget allocated to it, other than money to purchase the video camera when the program first began.  Inmates paid the remaining costs, including the cost of the DVD and the costs of mailing.

If an inmate wanted to make a talking letter, he would submit an Interview/Information request form to the Recreation Department.  A recreation leader would contact the inmate to go over the rules and to set up a time for the inmate to tape the letter.  Among other things, the rules:

- Required that the inmate fill out an information sheet and sign a copy of the rules.

- Provided that all recipients would be screened for appropriateness.

- Prohibited gang symbols, gang names and foul, abusive or sexual language.

- Mandated that inmates use first names only.

- Prohibited inmates from giving out addresses or telephone numbers.

- Provided that all DVDs may be subject to staff review.[4]

The rules do not explicitly prohibit the use of languages other than English.  (*See* Mot. Prelim. Inj. Ex. K (dkt. #11-6).)

Inmates were told that if they violated these rules, they would receive a conduct report and their tape would be destroyed without a refund.  On the other hand, an inmate's request to make a talking letter would be honored so long as he followed all required policies, and a recreation leader was available to manage the associated paperwork and monitor the making of the video.  Once an inmate completed his talking letter, the recreation leader would immediately mail it out without retaining a copy.

As a corrections supervisor, defendant Barton has denied talking letter requests in the past when the letter violated JCI or DOC policies.  For instance, Barton denied a prisoner's request to make a talking letter for a person not on his visiting list, and another prisoner's request to make a talking letter for a person with whom he had a no-contact order.  Barton has also denied requests to make talking letters in Spanish.

As noted above, with the exception of the initial video camera purchase, there has never been money in JCI's budget for the talking letter program, including for translation or interpretation services.  JCI also did not have a system in place to retain copies of talking

---

[4] As for this last bullet point, Lagar places great emphasis on defendants' apparently erroneous substitution of the word "are" for the words "may be" with respect to talking letter being subject to staff review, contending that it evinces a strategic intent on defendants' part to deceive the court and bolster their security justifications.  The court does not believe the error reasonably suggests a calculated attempt at deceit, particularly given that defendants themselves proposed the correctly-worded rules as a finding of fact.  (DPFOF (dkt. #21) ¶ 29.)  In any event, the court is aware of the correct wording, as reflected above.

letters, as it did with phone calls.  Rather, talking letters were monitored during the recording itself and then immediately mailed, which enabled JCI to run the program with no additional costs.  According to JCI's Corrections Security Director, Kevin R. Garceau, the lack of funds and consequent lack of infrastructure meant the only practical way to monitor talking letters effectively was to have a recreation leader present during recording who could understand the content in real time.  (Decl. of Kevin R. Garceau (dkt. #23) ¶ 25.)

The recreation leader position does not require Spanish fluency, nor do any of the named defendants have the authority to change the position's description to require bilingualism.  As a consequence, JCI has not had a Spanish-speaking recreation leader since the beginning of the talking letter program.  Based on his experience as JCI's Security Director, Garceau believes that allowing inmates to create talking letters in languages other than English would create an "intolerable" risk to the safety of JCI, its staff, its inmates and the public.  (Defs.' Reply DPFOF (dkt. #36) ¶ 42.)  Inmates are, therefore, prohibited from making talking letters in Spanish, although Lagar points out that bilingual staff members are available to listen to telephone calls, if necessary, and could serve that same function with respect to talking letters.

JCI officials were particularly concerned with ensuring that inmates not use talking letters to re-victimize previous victims.  If an inmate managed to send an abusive video to a previous victim, that could prove even more traumatic than a comparable letter, although Lagar contends that the Talking Letter Information Sheet (dkt. #22-1, at 3), which requires the inmate to identify the recipient, would mitigate those concerns by allowing JCI staff to determine beforehand whether the intended recipient was a victim.  (Pl.'s PFOF (dkt. #30) ¶ 29.)  A video could also prove more damaging than a letter if an inmate attempted to

solicit money or assistance, as many inmates are skilled at manipulation and could use the video component to further their illicit goals substantially.

###    ii.    Administration and Suspension of Program

When Barton arrived in 2011, JCI had one recreation leader, Eilene Miller.  In 2012, Barton added a second recreation leader, who left the position in September of 2013.  In September of 2014, Miller likewise left her position as recreation leader.  After Miller's departure, Barton relied on interim recreation leaders and, for a four-month period, JCI had no recreation leader at all.  Barton eventually hired a new recreation leader, Kathy Zipfel, on February 8, 2015, who in addition to being new to the DOC, was extremely busy learning to manage the various programs for which she is responsible.

In January of 2015, before Zipfel began work at JCI, Barton administered the talking letter program himself, helping three inmates create and mail talking letters.  Barton found that the process took about two to three hours per talking letter, requiring him to notify the inmate, move him to the recreation building, record and review the letter, and then complete the disbursement process.  After this hands-on experience, Barton spoke to the Warden, explaining his belief that the recreation leader had no time to facilitate the program, which had proven to be time-consuming.  Accordingly, in mid-January of 2015, JCI indefinitely suspended the talking letter program.

The parties dispute the reason for the suspension of the program.  Defendants represent it was simply due to the lack of staff time described above, while Lagar contends the program was suspended in retaliation for his complaints.[5]   Since the program's

---

[5] Proof of this motive would be by inference alone, since Lagar has no admissible evidence to support his contention.  For example, Lagar's letter to defendant Tegels, on which he relies (dkt. #10),

suspension, Barton has received three talking letter requests, all of which he returned with an explanation that the program is on hold until further notice.

There are no plans to restart the program, but inmates remain free to communicate with friends and family in all the traditional ways (that is, through written letters, telephone calls and in-person visits).  JCI also continues to offer a program called "Father's Video Book," which allows an inmate to read a children's book from the institutional library on DVD and send the recording to his child.  (*See* Aff. of Humberto Lagar Ex. 7 (dkt. #31-7) 1-3.)  Apparently, Redgranite Correctional Institution continues to offer its own version of a talking letter program to inmates as well.  (Defs.' Resp. PPFOF (dkt. #35) ¶ 37.)

Lagar proposes alternative means of administering the talking letter program that would accommodate the wishes of Spanish-speaking inmates to record Spanish talking letters.  Specifically, he proposes:

- mailing out the DVD to be translated by a Spanish-speaking DOC employee;

- sending an audio recording of the DVD via e-mail to a Spanish-speaking employee to be screened; or

- requiring a Spanish-speaking DOC employee to listen to the DVD for screening purposes.

Obviously, Lagar's proposals only address the Spanish speaking issues, not JCI's more broadly articulated reason for suspending the talking letter program altogether.  Moreover,

---

reports that Lagar was told by an officer, who was in turn told by Barton, that JCI was going to terminate the talking letter program because of his lawsuit.  This double hearsay is inadmissible, and cannot serve as proof that the program was *actually* terminated because of Lagar's lawsuit.  His complaint, which he also cites in support, quotes another letter he wrote to a non-defendant, Dr. Baskin, contending that Institution Complaint Examiner, Jodi Dougherty, told Lagar that if he pursued his complaint, JCI would terminate the talking letter program.  (Compl. (dkt. #1) ¶ 410.)  Again, these out-of-court statements cannot serve as evidence of the truth of those statements against the named defendants here.

even if the program were still active, defendants maintain that Lagar's proposals would not be acceptable.  This is because JCI has never had an in-house interpreter.  When it has translation needs, it typically relies on Spanish-speaking staff members to assist voluntarily and only as available.  JCI is also rurally located, so it has little opportunity to hire Spanish speakers from the surrounding community.  As of 2012, when Lagar made his request to record a Spanish talking letter, current JCI staff members were neither willing to provide bilingual services, nor did they believe themselves competent to do so.

As of early 2015, JCI had just one staff member fluent in Spanish.  He works third shift as a corrections officer and started at JCI on October 6, 2013.  As his availability permits, he voluntarily reviews inmate-to-inmate mail written in Spanish, and he also reviews Spanish-language mail directed to non-inmates if there is reason to believe there is an issue.  Reading and translating mail is not part of his position description, however, even though he has been voluntarily assisting in that manner since he started work.  Defendants contend that he *cannot* be required to take on this task.  Moreover, third shift is already minimally staffed, and to ask this lone staff member to review talking letters would leave him without time to monitor mail and phone calls in Spanish, much less attend to his regular duties.  (Defs.' Reply DPFOF (dkt. #36) ¶ 65.)  This staff member would only have time to take on this additional responsibility if he were called in and paid overtime, as well as free to refuse this additional work.  Furthermore, as previously stated, JCI has no funds to pay him for administering the talking letter program, and none of the defendants has the authority to reallocate JCI's resources.

Lagar also suggested sending the DVDs to other institutions, although none of the defendants would have the authority to require DOC employees to review JCI talking

letters.  There is also no additional staff time available for this undertaking: JCI and several other DOC institutions are generally understaffed, with JCI short by two sergeants, seven corrections officers and nine, non-uniformed staff members.  Defendants maintain that it would be reckless to pull staff away from their posts to assist in the talking letter program, as that would cause their performance of their expected duties to suffer.  Instituting an interpretation service for talking letters would also present several, additional logistical difficulties.  For example, JCI would have to offer similar services for other languages, and the program would become unmanageable if a significant number of inmates began asking to make talking letters languages other than English.

### C. DOC Directive For Limited English Proficiency Offenders

On a related note, the DOC enacted Executive Directive #71, which provides in part that:

> DOC shall within available resource constraints take steps to continue providing [Limited English Proficiency ("LEP")] offenders in its custody, or under its supervision, meaningful access to vital documents, important information and health services and to ensure they are not precluded from accessing or participating in important programs or proceedings, including those which may affect the duration and condition of their confinement or favorable classification.

Consistent with this directive, JCI can request an interpreter from DOC central when an inmate requires interpretation for important services or programs.  However, DOC central only provides interpretation services required to provide meaningful access to important programs identified in Executive Directive #71, including:  physical and mental health

services; revocation and disciplinary proceedings; and parole and program review classification hearings and reports.[6]

Because the talking letter program is considered a leisure activity, it does not fall within Executive Directive #71's purview.  Thus, the DOC would not provide an interpreter to administer it, nor does it fit the parameters necessary to pay for a telephone interpreter vendor service under Executive Directive #71.  Regardless, the DOC would not provide an interpreter for Lagar, specifically, because he understands and speaks, reads and writes English fluently.  LEP offenders are those who do not speak English as their primary language, and have only a limited English facility.  Thus, Lagar's language abilities did not prevent him from using the talking letter program, just his doing so in Spanish.

### III. Lagar's Attempts To Send A Talking Letter

In May of 2012, Lagar spoke to another inmate about sending a Mother's Day Card.  The inmate suggested that Lagar send her a talking letter instead.  According to Lagar, he then sought additional information about the program from other inmates, who told him that he could send a talking letter to anyone on his visiting list.[7]  Because his mother had not seen him since 2005, he decided to send her a talking letter.

On June 19, 2012, Lagar submitted an Interview/Information Request to defendant Miller, stating: "I need to schedule a time with you so that I can have made a talking letter to my mother.  It'll be in Spanish.  She doesn't know to[o] much [E]nglish."  Miller

---

[6] JCI can also use a telephone vendor, but there is a cost per minute for the use of such services, and so it would generally use them only for the types of programs identified by Executive Directive #71.

[7] Defendants object to these proposed findings of fact as inadmissible hearsay.  (*See* Defs.' Resp. PPFOF (dkt. #35) ¶¶ 11-12.)  They are, of course, inadmissible for the truth of the matter asserted, but admissible for purposes of showing what Lagar believed and intended.

responded, "All talking letters must be in English format."  (Decl. of Scott Barton Ex. 1006

(dkt. #22-7).)

On July 9, Lagar submitted a follow-up Interview/Information Request form to

Miller, stating:

> Ms. Miller, I have spoken to several institution officials
> regarding not being able to speak in Spanish while making the
> talking letter and they have all said that I should be allowed to
> do this in Spanish.
>
> It does seem to me like this is an unfair type of rule that you're
> enforcing here.  Spanish is my first language.  I need to be
> allowed to make this talking letter in Spanish.
>
> Please reply.  Thank you.

(*Id.* at Ex. 1007 (dkt. #22-8).)  Miller responded:

> Did you contact Mr. Barton?  He is my supervisor, and I did
> state that an interpreter would be needed in order for it to be
> done in Spanish -- so you need to contact him to get that
> approved.

(*Id.*)

On July 18, Lagar submitted an Interview/Information Request to Barton, inquiring

why he and other Latino inmates were not able to send out a talking letter in Spanish, as

well as expressing his need to send such a letter to his mother.  Barton responded that

Spanish talking letters were not allowed at that time.

On July 23, Lagar submitted a letter to Barton that read:

> I have been informed that you're looking into my request
> regarding being able to send my mother a Talking Letter in
> Spanish.  Look, I had sent you a request July 10 and 18, 2012
> however you had never replied.  It seems to me like you have a
> habit of doing, or shall I say refusing to reply to my legit
> requests.  That's not a good thing to do in public office.

13

> Look, there are other [S]panish speaking inmates in this institution who would like to send their love[d] ones a Talking Letter as well.  Can you please respond with the latest status pertaining to this presented situation?  Thank you for your time and cooperation in this important matter.

(*Id.* at Ex. 1002 (dkt. #22-3) 2.)

Apparently after receiving no reply, Lagar again wrote to Barton on July 25 via an Interview/Information Request.  Lagar stated that since he had been at JCI, he had never seen a recreation leader that could speak Spanish, and that as a result, neither he nor any other Latino inmates at JCI had ever been able to participate in the talking letter program.  Lagar also asked how many more years it would be before they could.  Finally, Lagar acknowledged that he knew English, but indicated that his parents did not know it "like I can speak it."  (*Id.* at Ex. 1003 (dkt. #22-4) 2.)

That same day, Barton responded to Lagar's letter denying his request to send a Spanish talking letter.  In relevant part, his response read as follows:

> 1. The request for a talking letter is approved or denied by the Program Director.  According to the rules for a talking letter, the Recreation leader must be present to understand the contexts of the materials being communicated; at this time I do not have a Recreation Leader that can interpret Spanish.
>
> . . .
>
> 5. If there are other requests for Spanish speaking inmates, they too can follow the procedure and send in the request to Mrs. Miller.
>
> Furthermore, Mr. Lagar, you appear to communicate clearly through written, verbal, and phone conversations in English.

Also on July 25, Lagar submitted an Interview/Information Request to then Warden Hepp, stating that he and other Latino inmates could not participate in the talking letter program because of the lack of an interpreter; and they were "being discriminated against"

14

because they could not record talking letters in Spanish.  Barton claims that he wrote

another letter to Lagar on July 31, as follows:

> In order to understand the context of the message being shared, the recreation leader must be able to understand and interpret the language.

> Rule 6-7 on the back of the talking letter form are important for the protection of family and/or victims in which the letter maybe (*sic*) intended.

> - #6 No Gang symbols, gang names, foul language, abusive language or language sexual in nature will be tolerated.

> - #7 First names only when recording the talking letter.

> - #8 No addresses or telephone numbers may be give[n] out.

> It would be extremely difficult for our staff to enforce the above rules and protect victims if they were not able to interpret the language being used.  Furthermore, Central Office has conceded by stating, "Since this is an optional program that has no impact on the inmate's welfare, conditions of confinement/supervision, duration of incarceration, etc., I would assume this doesn't fit the definition of a "vital document" and therefore DOC would not be required to cover the cost of interpretation."  The individual is able to send the letter home and request that a family member interpret the letter from English to Spanish.

(Decl. of Scott Barton Ex. 1003 (dkt. #22-4) 6.)[8]

On October 1, Lagar submitted an Interview/Information Request to Barton asking

again if he could send a talking letter to his mother in Spanish.  He stated, "Please, no more

discrimination.  She has not seen me since 2005."  To this request, Barton responded

tersely, "No."  (*Id.* at Ex. 1004 (dkt. #22-5) 1.)  On October 7, Lagar followed up with

Miller, requesting again that she allow him to participate in the talking letter program.  He

---

[8] Lagar contends that he never received this letter, suggests that it has been fabricated, and notes that it is signed by Barton, but refers to Barton in the third person throughout.  (*See id.* ("I am supporting Mr. Barton's decision to deny allowing the talking letter to be done in Spanish. . . . Sincerely, Scott Barton").)

specifically asked that she "view the October 1, 2012 Addendum to the JCI Handbook (Pg. #6)," which provides the following notice:

> The Wisconsin Department of Corrections (DOC) shall within available resource constraints take reasonable steps to continue providing Limited English Proficiency (LEP) offenders in its custody, or under its supervision, meaningful access to vital documents, important information and health services and to ensure they are not precluded from accessing or participating in important programs or proceedings, including those which may affect the duration and condition of their confinement or favorable classification.  This shall be done at no cost to the inmate.  The DOC shall not retaliate against any LEP offender for requesting such access.   The DOC does not prohibit communication in languages other than English, either by policy or practice, except where security practices require.

(*Id.* at Ex. 1008 (dkt. #22-9) 6.)   As previously noted, however, Lagar is not an LEP offender.

Finally, on October 10, Lagar again submitted an Interview/Information Request to Barton, which states, "This is my third request that I have sent you regarding wanting to be able to make a Talking Letter to my mother who I haven't seen in 7 years.  I need to make this T.L. in Spanish.  See new rule that allows this to be." (*Id.* at Ex. 1004 (dkt. #22-5) 2.) Barton responded, once again denying the request:

> I have addressed this issue.  You may communicate in English and have a family member translate.  Not allowed to do T.L. in Spanish.

(*Id.*)  After filing an administrative complaint (*see* Defs.' Reply DPFOF (dkt. #36) ¶¶ 99-102), Lagar filed the present lawsuit.

16

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact and that it is entitled to relief. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the initial burden is met, for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  The nonmoving party may not "simply show some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Nor may the nonmoving party "merely rely on conclusory pleadings" to withstand the motion. *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987).  Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

The standard for obtaining a preliminary injunction is not dissimilar, except the burden begins and ends with the moving party, who "must show that its case has 'some likelihood of success on the merits' and that it has 'no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied.'" *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (quoting *Ezell v. City of Chi.*, 651 F.3d 684, 694 (7th Cir. 2011)).  As discussed below, the court finds that plaintiff has no possibility of

succeeding on the merits -- indeed, that defendants are entitled to summary judgment. Thus, plaintiff cannot satisfy this threshold requirement for obtaining a preliminary injunction. Regardless, plaintiff's request is rendered moot both because Lagar is no longer incarcerated and because defendant has discontinued the talking letter program entirely.[9] *See, e.g.*, *Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011) (claims for injunctive relief mooted when inmate transferred to a different institution, such that any relief granted "would be purely speculative in nature" (quoting *Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009)). Accordingly, his request for a preliminary injunction will be denied.

## I.  First Amendment Claim

In its screening order, the court addressed plaintiff's First Amendment claim under the rubric of *Procunier v. Martinez*, 416 U.S. 396 (1974), *abrogated in part on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989), which governs non-legal outgoing mail, noting that the talking letter is a "somewhat unusual form of correspondence," but that it saw no reason *Martinez* would not apply. (Jan. 22, 2015 Opinion & Order (dkt. #8) 5.) Neither party challenges the court's application of this standard, and so the court employs it in resolving defendants' motion for summary judgment.[10]

---

[9] As noted above, plaintiff contends that prison officials actually suspended the program in retaliation for the present lawsuit, but he has not pled a retaliation claim in this lawsuit, nor has he sought leave to amend to add such a claim. Furthermore, this court's general policy is to require plaintiffs to raise new claims of retaliation in a lawsuit *separate* from that alleged to have provoked the retaliation. *See, e.g.*, *Awe v. Endicott,* No. 07-C-309-C, 2007 WL 5514745, at *1 (W.D. Wis. Oct. 10, 2007); *Godwin v. Sutton*, No. 05-C-493-C, 2005 WL 6169238, at *1 (W.D. Wis. Oct. 19, 2005). Thus, the court takes no position on the possible merit of such a claim.

[10] Although defendants do not argue for it (understandably, given the court's screening order), the other possibility would be to proceed under the standard of *Turner v. Safley*, 482 U.S. 78 (1987), which this court has applied at least once before to an inmate's claims that requiring him to communicate in English over the telephone violated his First Amendment rights. *See Boriboune v. Litscher*, No. 03-C-50-C, 2003 WL 23208940 (W.D. Wis. Feb. 24, 2003), *aff'd*, 91 F. App'x 498 (7th

The *Martinez* framework asks *first* whether the challenged practice furthers an important or substantial government interest unrelated to suppression of expression, and *second* whether the challenged action is no greater than necessary or essential to the protection of that interest.  *Martinez*, 416 U.S. at 413; *Koutnik v. Brown*, 456 F.3d 777, 784 (7th Cir. 2006).  As for the first, plaintiff recognizes in his brief that the general practice of regulating talking letters serves an "important and substantial governmental interest" -- specifically, the security of the correctional institution. *See Koutnik v. Brown*, 456 F.3d 777, 784 (7th Cir. 2006) (citing *Martinez*, 416 U.S. at 413) (interests under *Martinez* include "security, order, and rehabilitation").  The state also has a substantial interest in protecting the public, including an inmate's family and friends, from manipulation and other "antisocial acts." *See Woods v. Comm'r of Ind. Dep't of Corr.*, 652 F.3d 745, 748 (7th Cir. 2011) (analyzing whether regulation preventing advertising for pen pals "was reasonably related to the legitimate objective of curtailing inmate fraud"); *cf. Felce v. Fiedler*, 97 F.2d 1484, 1500 (7th Cir. 1992) (state has substantial interest in protecting public from antisocial acts of a parolee).  In fact, plaintiff concedes in his brief that the rules of the talking letter program "perfectly coincide with the established standard in *Martinez*," at least as written.  (Pl.'s Br. Opp'n Mot. Summ. J. (dkt. #28) 5.)

This brings us to the second prong of *Martinez*.  Specifically, plaintiff contends that defendants went *beyond* those regulations by reading in an unnecessary English-language requirement that does not exist in the rules themselves.  Plaintiff is at least technically

---

Cir. 2003).  Indeed, it is possible *Turner* would be a better fit in the context of this particular case as it now appears.  The *Turner* standard is more deferential to prison officials than the *Martinez* standard, asking only if the challenged regulation is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.  The point is a moot one here, since the court concludes that defendants are entitled to summary judgment under the more demanding *Martinez* standard as well.

correct -- the talking letter rules do not specifically mandate that talking letters be sent in English -- but this argument elevates form over substance.   The rules *do* prohibit gang names, foul language, abusive language and sexual language.   (*See* Mot. Prelim. Inj. Ex. K (dkt. #11-6) 2.)   From this it necessarily follows that the monitoring staff member must be able to understand the inmate's message; otherwise, it would not be possible for him or her to enforce the rules as written.   And it is undisputed that, during the time period relevant to the complaint, JCI did not have *any* staff members willing and able to provide Spanish interpretation services, let alone any bilingual recreation leaders.   Thus, the court concludes that the *de facto* English-language requirement, like the talking letter program rules themselves, served an "important and substantial governmental interest" in institutional security and protecting the public.

"The more difficult task . . . is not in identifying an important governmental interest at stake, rather it is in determining whether the enforcement of [the English-language requirement] was no greater an infringement upon [Lagar's rights] than necessary to protect the state's interest." *Rios v. Lane*, 812 F.2d 1032, 1037 (7th Cir. 1987); *see also Koutnik*, 456 F.3d at 784-85.   Plaintiff argues that the infringement upon his First Amendment rights was far greater than it needed to be, proposing a number of alternatives that, in his estimation, JCI could have employed to allow him to send a Spanish talking letter without implicating security concerns.   In particular, plaintiff suggests that JCI could have (1) mailed the DVD to a Spanish-speaking DOC employee, (2) sent an audio file via e-mail to a Spanish-speaking DOC employee, or (3) called a Spanish-speaking DOC employee to have them screen the DVD.

All of plaintiff's alternative proposals have one thing in common: they assume the ready availability of a Spanish-speaking DOC employee to serve as interpreter. Even assuming that the defendants should have recruited non-recreation employees to administer a recreation program (and the court is not prepared to say so, given the deference due to prison officials in running prisons), from 2007 until October of 2013, JCI *had* no bilingual employees competent to provide interpretation services. There are also no resources available to pay staff overtime to take on additional duties outside regular hours, and the named defendants lack authority to reallocate resources toward the talking letter program to cover any such costs. Indeed, the court takes judicial notice that however laudable may be this additional service, DOC had been operating understaffed throughout this period due to a combination of factors, including budget cuts, retirements and other departures, and an inability to recruit and hire qualified replacements.

The same problems arise with respect to the possibility of reaching out to other DOC institutions for assistance with interpretation of talking letters. Not only do the named defendants lack the authority to require other DOC employees to shoulder this additional duty, there are no funds allocated to cover *any* related expenses, since the talking letter program was meant to be financially self-sufficient. Moreover, the defendants lack the authority to reallocate resources to pay non-JCI employees to administer a JCI program. Indeed, the JCI Security Director, Kevin Garceau, testified without contradiction that it would be reckless to pull other DOC staff from their expected duties to participate in an optional recreation program. (Decl. of Kevin R. Garceau (dkt. #23) ¶ 35; Pl.'s Resp. DPFOF (dkt. #29) ¶ 73.)

21

DOC employees, such as the defendants and Garceau, are in a better position to make judgments related to prison administration, including matters of staffing, than this court, *see Overton v. Bazzetta*, 539 U.S. 126, 132 (2003), and the court agrees that it would drain the DOC's limited resources to mandate that it seek out interpreters for any and all inmates who wish to record talking letters in languages other than English. *Cf. DeSimone v. Bartow*, No. 08-C-638, 2009 WL 1648914, at *5 (E.D. Wis. June 10, 2009) (prison could prevent inmate from writing in "Atlantean" under RLUIPA, notwithstanding his willingness to provide a translation key; "case-by-case review of everything DeSimone elects to write in the Atlantean language would be a significant drain on the human resources of the WRC"), *aff'd*, 355 F. App'x 44 (7th Cir. 2009)

Plaintiff attempts to minimize defendants' recitation of the obstacles associated with permitting Spanish talking letters by pointing out that Redgranite apparently maintains its own talking letter program without issue.  Unfortunately, the record contains no information about that program or Redgranite's capabilities to administer it.  For example, Redgranite may, like JCI, actually *prohibit* talking letters in languages other than English.  If it does allow Spanish talking letters, it may be because Redgranite has available resources that JCI lacks.  In any event, without evidence in the record relating to Redgranite or its talking letter program, the court cannot infer from Redgranite's apparent ability to offer a program has any bearing on whether JCI can feasibly offer its own version of that program.

Plaintiff relies primarily on *Kikumura v. Turner*, 28 F.3d 592 (7th Cir. 1994), for the proposition that "the summary exclusion of foreign language materials is unconstitutional." *Id.* at 598.  In *Kikumura*, a Japanese inmate challenged a prison's "alleged de facto policy of summarily rejecting foreign language publications without making any effort to translate or

screen such material." *Id.* at 597 (footnote omitted). The Seventh Circuit analyzed that policy under the *Turner* standard addressed previously in footnote 10 above, concluding that the district court had erred in granting summary judgment to the prison warden. First, the Seventh Circuit noted that the warden made *no* determination as to whether the materials presented a security risk, but instead "rejected them precisely because he was unable to do so." *Id.* at 598. Second, it found a factual dispute as to whether Kikumura's English abilities allowed him to receive English publications as an alternative means to exercise his right to receive information. *Id.* at 598-99. Third, the court pointed out that the prison had made *no* effort to screen the publications before rejecting them, despite the "obvious implication" in *Turner* that "a prison may not restrict a prisoner's rights without even looking to see how the rights might be accommodated and estimating the expense entailed by doing so." *Id.* at 599. Accordingly, the court vacated the grant of summary judgment with respect to Kikumura's claim for injunctive and declaratory relief, although it affirmed the grant of qualified immunity on his claim for damages.

There is at least one material difference between *Kikumura* and this case. The Seventh Circuit in *Kikumura* explicitly stated that its discussion was "narrowly limited to the regime we are reviewing: where a prison makes *no effort at all* to accommodate the constitutional rights of prisoners native in languages other than English." *Id.* at 598 (emphasis added). The right involved in this case -- the right protected by *Martinez* -- is the right to correspond with people outside of the prison, including family members. *See Martinez*, 416 U.S. at 412-13 & n.13; *Boriboune*, 2003 WL 23208940, at *3 ("It is well-established that prisoners have a First Amendment right to communicate with those outside the prison.").

If, as in *Kikumura*, JCI had made "no effort at all" to accommodate that right, this would be a different case, but Lagar retained the right to write letters, make phone calls and conduct visits with his mother in Spanish, or to send English-language talking letters that others could interpret on her behalf.  Thus, unlike the prison in *Kikumura,* JCI "[did] not flatly prohibit all non-English communication."  *Boriboune*, 2003 WL 23208940, at *3.  Instead, JCI prohibited a certain form of communication after reasonably concluding it was impractical given the institution's limited resources.  Said another way, Lagar certainly had a constitutional right to communicate with his family, but the court cannot conclude he had a constitutional right to do so in whatever form he pleased.  *See Pell v. Procunier*, 417 U.S. 817, 827-28 (1974) ("Accordingly, in light of the alternative channels of communication that are open to prison inmates, we cannot say on the record in this case that this restriction on one manner in which prisoners can communicate with persons outside of prison is unconstitutional.").

The court sympathizes with Lagar's desire to communicate with his mother in the manner he believes best, and likely most meaningful, but the rule prohibiting talking letters in languages other than English served important and substantial government interests.  On this record, the *de facto* English-language requirement was no greater than necessary to protect those interests.

Even if this were not so, as the above discussion also demonstrates, defendants are certainly entitled to summary judgment on Lagar's First Amendment claim for damages on grounds of qualified immunity.  "Government officials who are performing discretionary functions are immune from liability for civil damages unless they violate clearly established constitutional rights of which a reasonable person would have known."  *Id.* at 596 (quoting

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   In evaluating qualified immunity at summary judgment, courts engage in a two-pronged analysis.   *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014).   The first asks whether the facts, taken in the light most favorable to the non-moving party, demonstrate a violation of a federal right.   *Id.*   The court has already answered that question in the negative, at least on the record before it.[11]

The second asks whether the right in question was "clearly established" at the time of the violation.   *Id.* at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).   Courts should evaluate this question based on the state of the law at the time of an incident and in light of the "specific context" of the case.   *Id.* (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)).   In the context of this case, Lagar has pointed to nothing suggesting that a reasonable person would have known he was violating Lagar's First Amendment rights by enforcing policies that prohibited Lagar from recording a talking letter in Spanish.   The policies in question served penological interests in security and protecting the public, both of which have been repeatedly recognized as substantial government interests in the context of prison administration.   And the defendants here have come forward with undisputed evidence that retaining the services of an interpreter was not a viable option in light of the limited resources available to the program.   Furthermore, Lagar in particular had access to multiple means of communicating with his family, including by talking letter in English, even though this was less desirable.   Finally, because Lagar was, in fact, fluent in English, he was not "denied" access to the program.

---

[11] As the price of real time translation technology declines, or the institution's future budget allows for greater language resources, the balance here may change.   Until then, however, JCI's lack of a bi-lingual recreation leader (or a qualified interpreter able to devote a minimum of two to three hours) for the real time editing process contemplated for the making of a single video was sufficiently prohibitive to justify JCI's ban on Spanish talking letters.

Given this context, the court cannot say Lagar has shown that the unlawfulness of defendants' actions' was "'apparent' from pre-existing law." *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 359 (7th Cir. 2005) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Accordingly, even if there *was* a violation of Lagar's First Amendment rights, defendants are immune from liability for damages.

## II.  Equal Protection

As the court noted at screening, inmates retain the right to equal protection in the prison context, but generally speaking unequal treatment among inmates "is justified if it bears a rational relation to legitimate penal interest[s]." *Williams v. Lane*, 851 F.2d 867, 881 (7th Cir. 1988) (citing *Hudson v. Palmer*, 468 U.S. 517, 522-23 (1984)).[12]  The above First Amendment discussion compels the conclusion that the *de facto* English-language requirement for the talking letter program served legitimate penological interests, both in security and in protecting the public from antisocial or manipulative behaviors, at least where JCI has come forward with evidence that expanding the program to other languages was impractical.  Under the particular circumstances of this case, the rule ensured that the

---

[12] In some circumstances, it may be possible for language to serve as a proxy for race or national origin, which would require the application of a higher level of scrutiny.  *See Kikumura*, 28 F.3d at 599-600 (leaving open question of when it might be appropriate for classifications on the basis of language to be treated as classifications on the basis of national origin).  However, the court is not persuaded that this is the appropriate case for such treatment.  As already discussed, the only plaintiff before the court, Lagar, is fluent in English and could record a talking letter in compliance with the rules.  The theory that the English-language requirement is nevertheless a proxy to discriminate against him on the basis of his Cuban national origin, or because he is Latino, is, therefore, simply not true, at least in his case.  Nor is there any evidence before the court regarding the makeup of the JCI inmate population, or the languages those inmates' families generally speak, to make Lagar's theory viable.  *See id.* at 600 ("It may well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis.") (quoting *Hernandez v. New York*, 500 U.S. 352, 367-70 (1991)).  Accordingly, the court analyzes Lagar's equal protection claim only to determine whether any difference in treatment he endured bore a rational relation to legitimate penal interests.

recreation leaders, who were realistically the only staff available to monitor the making of those letters, could effectively enforce the rules against abusive, sexual or gang-related contents -- rules that even Lagar concedes meet the stricter standards of *Martinez*.   Thus, even viewing the record in the light most favorable to Lagar, the court cannot say that the difference in treatment here was arbitrary, and so defendants are entitled to summary judgment on this claim as well.

ORDER

IT IS ORDERED that:

1) Plaintiff Humberto Lagar's motion for preliminary injunction (dkt. #11) is DENIED.

2) Defendants S. Barton, Eilene Miller and Lizzie Tegels's motion for summary judgment (dkt. #19) is GRANTED.

3) The clerk of court is directed to enter judgment and close this case.

Entered this 29th day of November, 2016.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge